UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------
In re:

DANIEL M. WOLPE and                          Chapter 7
SUSAN M. WOLPE,                              Case No.: 09-13469

                              Debtors.
-------------------------------------------------------------
RONALD ROSS and SUSAN ROSS,

                              Plaintiffs,
                                              Adv. Pro. No.: 09-90130
              v.

DANIEL M. WOLPE and SUSAN M. WOLPE,

                              Defendants.
-------------------------------------------------------------
APPEARANCES:

MCNAMEE, LOCHNER, TITUS & WILLIAMS, P.C.      Kenneth L. Gellhaus, Esq.
*Attorneys for Plaintiffs*
677 Broadway
Albany, New York 12207

EHRLICH & ARCODIA, P.C.                       Marc S. Ehrlich, Esq.
*Attorneys for Defendant Daniel M. Wolpe*
64 Second St.
Troy, New York 12180

KURZ & ASSOCIATES, L.L.C.                     Michael Kurz, Esq.
*Attorneys for Defendant Susan M. Wolpe*
2212 Western Avenue
P.O. Box 1502
Guilderland, New York 12084

Honorable Robert E. Littlefield, Jr., Chief United States Bankruptcy Judge

## MEMORANDUM-DECISION AND ORDER

The matter currently before the court is the adversary complaint filed by judgment

creditors Ronald and Susan Ross ("Creditors" or "Plaintiffs") requesting that the discharge of

Daniel M. Wolpe and Susan Wolpe (collectively, "Debtors" or "Defendants") be denied pursuant

to 11 U.S.C. § 727(a)(4)(A) and (B).[1]

### JURISDICTION

The court has jurisdiction over this core matter pursuant to 28 U.S.C. §§ 157(a),

157(b)(1), 157(b)(2)(J), and 1334(b).

### BACKGROUND

The Plaintiffs filed a civil lawsuit against the Debtors in Michigan regarding a real estate

transaction and received an award of damages in the amount of $169,993.67. Collection efforts

by the Creditors on the judgment culminated in the Debtors seeking relief under the Bankruptcy

Code. A Chapter 7 petition and related schedules, statements, and declarations, including the

Statement of Financial Affairs ("SOFA"), Declaration Concerning Debtor's Statement of

Financial Affairs, Declaration Concerning the Debtor's Schedules, Declaration Re: Electronic

Filing, and Form B22 ("Means Test") (collectively, the "Petition") were filed by the Debtors on

September 18, 2009. (Case No. 09-13469, ECF No. 1; Pls.' Ex. 1.) The Debtors' Chapter 7 case

was converted to Chapter 13 on November 19, 2009 and, subsequently, reconverted to Chapter 7

on September 23, 2010.

Initially, both Debtors were represented by David Goldin, Esq. who successfully moved

to withdraw as counsel by order dated October 1, 2010. (Case No. 09-13469, ECF No. 72; Pls.'

---

[1] Unless otherwise noted, all statutory references are to Title 11, United States Code.

Ex. 49.) Marc S. Ehrlich, Esq. was subsequently retained by Rabbi Wolpe; Michael Kurz, Esq. became counsel to Mrs. Wolpe.

Plaintiffs commenced the instant adversary proceeding with the filing of a complaint on November 17, 2009, alleging multiple omissions and false statements within the Debtors' petition, schedules, and SOFA. Rabbi Wolpe filed an Answer to the Complaint on November 30, 2010, and Mrs. Wolpe filed an Answer to the Complaint on December 1, 2010. The Debtors both denied the material allegations of the Complaint and asserted as an affirmative defense that any errors in the petition, schedules, and SOFA constituted scrivener's errors attributable to prior counsel. Mrs. Wolpe asserted, in the alternative, that any errors were the result of information supplied by Rabbi Wolpe, of which she had no direct knowledge and/or reasonably believed to be true. A two-day trial was conducted on November 8 and 9, 2011. The Debtors, as well as Mrs. Wolpe's ex-husband, Gary Schwack, and Attorney Goldin testified. Upon the conclusion of the trial, the court directed the parties to submit proposed findings of fact and conclusions of law and post-trial briefs. The matter was then taken under advisement.

## FACTS

The court makes the following findings of fact based upon the pleadings and the evidence adduced at trial. The testimony and documents received into evidence reveal the following:

1.    Daniel M. Wolpe graduated from New York University. (Trial Tr. vol. 1, 130, Nov. 8, 2011, ECF No. 145.) He was ordained as a rabbi after graduating from the University of Judaism, now known as the American Jewish University, with a master's degree and a rabbinic degree. (Trial Tr. vol. 1, 131.) Since being ordained, Rabbi Wolpe has been employed in his profession in Florida, Michigan, and New York. (Trial Tr. vol. 1, 132.) In 2011, Rabbi Wolpe was working part-time at a synagogue in Pennsylvania. (Trial Tr. vol. 1, 134; Pls.' Ex. 14, at 18-

20.) Mrs. Wolpe has a degree in nursing and became a licensed practical nurse after passing a

state board exam. (Trial Tr. vol. 2, 65-66, Nov. 9, 2011, ECF No. 146.)

     2.     Mrs. Wolpe filed a prior joint petition for bankruptcy protection in Florida in the

late 1990s with her former husband. (Trial Tr. vol. 1, 165-66.) As a result, she is familiar with

the paperwork and what has to be provided in connection with a bankruptcy case. (Trial Tr. vol.

1, 165.)

     3.     In July 2008, Rabbi Wolpe signed a four-year employment agreement with

Temple Israel of Albany that, among other things, provided for: (1) gross compensation of

$160,000 for the period of July 1, 2009 to June 30, 2010, with a salary increase of $16,000 on

July 1, 2010; (2) pension contributions of $13,333 on as of July 31, 2009 and $16,000 on July

31, 2010; (3) health insurance; and (4) salary offsets for a car and tuition at the Hebrew

Academy. (Trial Tr. vol. 1, 8-11; Pls.' Exs. 10, 11.) During July 2009, Rabbi Wolpe received a

check from Temple Israel for $9,463.03 representing the net pension payment referenced in his

employment contract. (Pls.' Ex. 31.) According to the Debtors, they utilized the pension funds

as ordinary income to pay expenses. (Trial Tr. vol. 1, 33-35; Trial Tr. vol. 2, 125-29.) The

Debtors did not report the $9,463 payment as income on their tax return. (Trial Tr. vol. 1, 34-35;

Pls.' Ex. 9.) On November 10, 2009, approximately two months after filing for bankruptcy

protection, Rabbi Wolpe executed an "Employment Separation and Release Agreement,"

acknowledging his resignation from Temple Israel. (Trial Tr. vol. 1, 28-29; Pls.' Ex. 12.)

     4.     Rabbi Wolpe met with Attorney Goldin on several occasions in connection with

the preparation of the Petition. (Trial Tr. vol. 1, 122-24.) Mrs. Wolpe met with Attorney Goldin

at least once for about thirty minutes several days before the Petition was filed. (Trial Tr. vol. 2,

20, 84.)

5.    The Debtors' petition, Declaration Concerning Debtor's Statement of Financial

Affairs, Declaration Concerning the Debtor's Schedules, and Line 57 of the Means Test were all

signed under penalty of perjury by the Debtors and provide, in part, that the information

contained in the referenced documents is true and correct. Rabbi Wolpe signed the petition and

accompanying papers at Attorney Goldin's office; Mrs. Wolpe did not sign them at Attorney

Goldin's office. (Trial Tr. vol. 1, 6; Trial Tr. vol. 2, 92.)   Mrs. Wolpe did not read or review

most of the schedules and summary filed with the joint petition. (Trial Tr. vol. 2, 93-94, 202-05;

Trial Tr. vol. 1, 122-23.)

6.    The Debtors' Declaration Re: Electronic Filing states, in part, "the undersigned

debtor(s), hereby declare under penalty of perjury, the information . . . we . . . have given . . . our

attorney and the information provided in the electronically filed petition is true and correct."

(Pls.' Ex. 1.) The Debtors both signed the declaration.

7.    The Debtors' Schedule B, titled, "Personal Property," indicates that neither debtor

is entitled to alimony, maintenance, support, or property settlements.

8.    The Debtors' original Schedule I, titled, "Current Income of Individual

Debtor(s)," lists Mr. Wolpe's occupation as Rabbi at Temple Israel and the occupation of Mrs.

Wolpe as a homemaker. The Debtors' monthly gross wages are listed on Schedule I and on the

Means Test[2] as $9,383.37.  No income attributable to alimony, maintenance, or support for the

Debtors' use or that of the Debtors' dependents is set forth on Schedule I or on the Means Test.

When asked on the Means Test at line 10 to set forth income from all other sources, the Debtors

---

[2] The Means Test states, in part, "All figures must reflect average monthly income for the six calendar months prior
to filing the bankruptcy case, ending on the last day of the month before the filing. If you received different amounts
of income during these six months, you must total the amounts received during the six months, divide this total by
six, and enter the result on the appropriate line." (Pls.' Ex. 1.)

list zero. Additionally, according to Schedule I, the Debtors did not reasonably anticipate any increase or decrease in their income to occur within the year following the filing of the Petition.

9.      On their original Schedule J, titled, "Current Expenditures of Individual Debtor(s)," the Debtors include a monthly medical and dental expense of $1,000, and monthly installment payments for a Kia Sportage in the amount of $306 and for the Hebrew Academy in the amount of $479.

10.     The Debtors filed amended Schedules I and J on December 23, 2009, in conjunction with the conversion of their case to Chapter 13. (Case No. 09-13469, ECF No. 20; Pls.' Ex. 2.) Amended Schedule I continues to show no income attributable to alimony, maintenance, or support, and no reasonably anticipated increase or decrease to the Debtors' income. The Debtors' monthly medical and dental expense remains at $1,000 on their amended Schedule J, however, the monthly installment payments for the Kia Sportage increased by $69.34 to $375.34 and for the Hebrew Academy by $21 to $500. Rabbi Wolpe conceded that he never wrote a check to the Hebrew Academy. (Trial Tr. vol. 1, 10-11.) A monthly expense for "pension" in the amount of $1,083.50 was added. The Debtors filed a second amended Schedule I on May 19, 2010, which shows a decrease in Rabbi Wolpe's salary and loans from family, but no income from child support. (Case No. 09-13469, ECF No. 34; Pls.' Ex. 3.) The Debtors filed a third amended Schedule I on May 20, 2010, which discloses income from child support. (Case No. 09-13469, ECF No. 36; Pls.' Ex. 5.)

11.     Under Question 1 on the Debtors' SOFA, titled, "Income From Employment or Operation of Business," the Debtors list Rabbi Wolpe's 2009 income from Temple Israel as $75,067 and Rabbi Wolpe's 2008 income from Beth Shalom as $82,000. In contrast to the Petition, the Debtors' 2009 Federal income tax return shows income of $156,306. (Pls.' Ex. 9.)

12.    Under Question 2 on the SOFA, titled, "Income Other Than From Employment or Operation of a Business," the Debtors respond "NONE." Rabbi Wolpe received a check dated August 31, 2009, for $4,000 from the Rabbinical Assembly. (Pls.' Ex. 32.) Rabbi Wolpe received a check dated August 24, 2009, for $1,000 from his mother. (Pls.' Ex. 34.) Rabbi Wolpe received a check dated July 16, 2009, for $5,000 from Rabbi Alex Greenbaum of the Beth El Congregation. (Pls.' Ex. 33.) These amounts were not reported on the Debtors' SOFA. Rabbi Wolpe testified that the three checks represent gifts. (Trial Tr. vol. 1, 85-89.)

13.    SOFA Question 3C, titled, "Payments to Creditors," requests that the Debtors list all payments made within one year immediately preceding the commencement of the case to or for the benefit of creditors who are or were insiders. The Debtors answer "NONE." In response to SOFA Question 7, titled, "Gifts," seeking a list of all gifts made within one year of filing, except those to family members aggregating less than $200 per individual family member, the Debtors also respond "NONE." Meanwhile, in the year prior to filing, there were at least three bank account transfers totaling $2,500 from an account jointly titled in the name of the Debtors and Mrs. Wolpe's mother to a second checking account titled in the name of the Debtors and Mrs. Wolpe's mother. (Pls.' Exs. 30, 46; Trial Tr. vol. 1, 65-66, 77-82; Trial Tr. vol. 2, 141-43.) Mrs. Wolpe testified that the second account was her mother's primary checking account. (Pls.' Ex. 46; Trial Tr. vol. 2, 134.) Rabbi Wolpe testified that he was aware of at least one of the transfers and believed it was a repayment of a loan from his mother-in-law, but was not certain. (Trial Tr. vol. 1, 74-75.) In March 2009, Mrs. Wolpe purchased a $950 piece of jewelry for her niece's sixteenth birthday. (Trial Tr. vol. 2, 185-92.)

14.    SOFA Question 4A, titled, "Suits and Administrative Proceedings, Execution, Garnishments and Attachments," asks the Debtors to list all suits to which either of the Debtors

was a party within one year immediately preceding the filing of the bankruptcy case. The

Debtors list only *Ross v. Wolpe*. The Debtors did not schedule *Baum v. Wolpe*, another case

resulting in a judgment being entered against Rabbi Wolpe on June 24, 2009. (Pls.' Ex. 42.)

15.    SOFA Question 15 is titled, "Prior Address of Debtor," and requests the addresses

of all premises occupied by the Debtors within three years of the Petition date. The Debtors

answer "NONE." At the time their bankruptcy case was commenced, the Debtors were residing

at 298 Hackett Boulevard, Albany, New York. (Trial Tr. vol. 1, 43.) Within three years of filing

the Petition, the Debtors had resided at 171 Tampa Avenue, Albany, New York (Trial Tr. vol. 1,

42-43) and 10464 Elgin Avenue, Huntington Woods, Michigan (Trial Tr. vol. 1, 44; Pls.' Ex.

43).

16.    SOFA Question 5, titled, "Repossessions, Foreclosures and Returns," requires a

listing of all property that has been sold at a foreclosure sale within one year preceding the

commencement of the Debtors' bankruptcy case. The Debtors reply "NONE." Rabbi Wolpe

testified that he believed the 10464 Elgin Avenue property in Michigan to be in foreclosure.

(Trial Tr. vol. 1, 45.)

17.    On October 24, 2003, Mrs. Wolpe's former husband, Gary Schwack, was ordered

to provide child support until the youngest of their two children reaches the age of eighteen (or

nineteen if still in high school) or until graduation from high school. (Pls.' Ex. 20.) Their

youngest child was born August 14, 1999. (Pls.' Ex. 20.) Mr. Schwack testified that in 2005,

Mrs. Wolpe threatened to have him incarcerated for failure to pay support. (Trial Tr. vol. 1, 170-

71.) The amount of child support Mr. Schwack was ordered to pay was modified in June 2006,

and again in June 2009, but the termination events remain the same. (Pls.' Exs. 21, 22.) Mr.

Schwack also testified that he paid child support in the amount of $452.77 every other week

during the period January 2009 through June 2009. (Trial Tr. vol. 1, 168; Trial Tr. vol. 2, 130-31.) The Plaintiffs introduced bank statements indicating Mrs. Wolpe received child support checks from the Florida State Disbursement Unit ("FLSDU") in the amount of $452.77 on February 12 and 26, 2009; March 12 and 26, 2009; April 9, 2009; May 7 and 21, 2009; June 4, 18 and 30, 2009; and July 2, 2009. (Pls.' Ex. 24.) Rabbi Wolpe testified that he did not know anything about the multiple $452.77 deposits made to their bank account. (Trial Tr. vol. 1, 67-70; Pls.' Ex 30.)

18.    In the months leading up to their bankruptcy filing, Mrs. Wolpe exchanged several emails with Mr. Schwack concerning his child support obligation. On June 24, 2009, she emailed Mr. Schwack a method to expedite the child support payment process. (Pls.' Ex. 25.) On August 7, 2009, Mrs. Wolpe emailed Mr. Schwack regarding late child support payments. (Pls.' Ex. 44A.) She also emailed Mr. Schwack on August 21, 2009, regarding severance pay and indicated that an "amount was not correct." (Pls.' Ex. 44B.) On September 2, 2009, Mrs. Wolpe again emailed Mr. Schwack about his child support payments (Pls.' Ex. 44C), and on September 30, 2009, she emailed him regarding the calculation of his child support obligation (Pls.' Ex. 44D). When questioned on direct if she sent emails in June or July 2009, to Mr. Schwack regarding child support issues, Mrs. Wolpe responded she could not recall specifically sending any emails to Mr. Schwack. (Trial Tr. vol. 2, 155-58.) Similarly, when asked if she sent one or more emails to Mr. Schwack in August 2009, with respect to support, she again could not remember doing so. (Trial Tr. vol. 1, 161-62.)

19.    Attorney Goldin requested, and was granted, leave to withdraw as counsel. The basis for the motion was, in part, due to:

> [U]ndue difficulty in securing complete and accurate information from the debtors. . . .

. . . [I]nformation concerning child support payments known directly by the co-debtor were (sic) not timely provided and have resulted in understatement of income by the debtors.

. . . Specifically, at the commencement of the case, full and complete information was not provided; full and complete information regarding child support paid and due to the co-debtor was not provided; updated financial information concerning debtor's new employment was not timely provided; complete checking account information to which the debtors may have access was not provided; and back up documentation regarding extraordinary medical expenses was not provided.

(Case No. 09-13469, ECF No. 57; Pls.' Ex. 49, at ¶¶ 5-7.) Attorney Goldin reiterated at the trial

that the statements contained within his affirmation in support of his motion were fair and

accurate. (Trail Tr. vol. 2, 49-51.)

## ARGUMENT

The Plaintiffs assert that they have established that the Debtors' petition, schedules,

SOFA, and subsequent amendments contain a series of material errors and omissions, including

understatement of income, omission of monies received by either Debtor as "other income,"

omission of gifts made to family members, and the omission of child support payments.

According to the Plaintiffs, the number of omissions and misstatements of facts combine to form

a critical mass of reckless and careless responses that rise to a reckless indifference to truthful

disclosure. As a result, the Plaintiffs contend the Debtors violated § 727(a)(4)(A) and (B), and

their discharge should be denied.

The Debtors both argue that any omissions, mischaracterizations, or misstatements that

appear in the petition, schedules, and SOFA were unintentional and inadvertent. The Debtors

also assert that the misstatements were not material and, thus, denial of their discharge is not

warranted. The Debtors also blame their former attorney for the omissions of required

information.

## DISCUSSION

### I.   Denial of a Discharge

A denial of discharge "imposes an extreme penalty for wrongdoing." *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996). It is the "death penalty of bankruptcy." *Levine v. Raymonda (In re Raymonda)*, No. 99-13523, Adv. Pro. No. 99-91199, slip op. at 4 (Bankr. N.D.N.Y. Feb. 9, 2001). As a result, the provisions of § 727 are construed strictly against the objecting party and liberally in favor of the debtor. *In re Chalasani*, 92 F.3d at 1310. It is well-settled that the party objecting to the granting of a discharge bears the burden of persuasion by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 289 (1991).

### II.   Denial of a Discharge Under § 727(a)(4)(A)

The court shall grant the debtor a discharge, unless "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." 11 U.S.C. § 727(a)(4)(A). The denial of a discharge under § 727(a)(4)(A) requires that the plaintiff establish that: "(1) the debtor made a statement under oath, (2) such statement was false, (3) the debtor knew the statement was false, (4) the statement was made with fraudulent intent, and (5) the statement related materially to the bankruptcy case." *Levine v. Hormovitis (In re Hormovitis)*, No. 07-11276, Adv. Pro. No. 07-90212, slip op. at 6 (Bankr. N.D.N.Y. Apr. 27, 2009) (citations omitted). Once the moving party meets its initial burden to produce evidence of a false statement, the burden of production shifts to the debtor to produce a credible explanation for the false statement. *Adler v. Ng (In re Adler)*, 395 B.R. 827, 841 (E.D.N.Y. 2008) (citation omitted). The overall burden, however, remains with the moving party. *Id.*

With respect to the knowledge element, a "statement is considered to have been made with knowledge of its falsity if it was known by the debtor to be false, made without belief in its truth, or made with reckless disregard for the truth." *Montey Corp. v. Maletta (In re Maletta)*,

159 B.R. 108, 112 (Bankr. D.Conn 1993) (citation omitted). A discharge may not be denied

under § 727(a)(4)(A) where the untruth was the result of mistake or inadvertence. *First Am.*

*Bank of New York v. Bodenstein (In re Bodenstein)*, 168 B.R. 23, 32 (Bankr. E.D.N.Y. 1994).

Proof that a statement was fraudulently made requires actual intent, not constructive

intent. *Dubrowsky v. Perlbinder (In re Dubrowsky)*, 244 B.R. 560, 571 (E.D.N.Y. 2000)

(citations omitted). It is not enough under § 727(a)(4)(A) that a debtor is merely careless in

completing documents to be filed with the court. *Sanderson v. Ptasinski (In re Ptasinski)*, 290

B.R. 16, 23 (Bankr. W.D.N.Y. 2003) (citation omitted). Courts have recognized that it is

unlikely that a debtor will admit to making a deliberate misstatement, thus, fraudulent intent may

be shown through circumstantial evidence or inferences from a course of conduct, all

surrounding circumstances, and an evident course of conduct. *O'Connell v. DeMartino (In re*

*DeMartino)*, 448 B.R. 122, 128 (Bankr. E.D.N.Y. 2011) (citations omitted). A court may find

intent to deceive in a "reckless disregard of both the serious nature of the information sought and

the necessary attention to detail and accuracy in answering." *In re Ptasinski*, 290 B.R. at 23

(*citing Diorio v. Kreisler-Borg Constr. Co.*, 497 F.2d 1330 (2d Cir. 1969)). Fraudulent intent

may be inferred from a series of incorrect statements contained in the schedules. *Castillo v.*

*Casado (In re Casado)*, 187 B.R. 446, 450 (Bankr. E.D.N.Y. 1995) (citations omitted); *see*

*Steibel v. Bressler (In re Bressler)*, 387 B.R. 446, 462 (Bankr. S.D.N.Y. 2008) (numerous

discrepancies, falsehoods, and omissions taken together display a pattern of misleading conduct

sufficient to establish a fraudulent false oath).

A debtor may not insulate himself by claiming that he failed to read his bankruptcy

schedules prior to signing them. *In re Zimmerman*, 320 B.R. 800, 806 (Bankr. M.D. Pa. 2005)

(citation omitted).

[I]f a debtor fails to read his or her bankruptcy schedules or Statement of Financial Affairs but nevertheless signs the declaration that is included at the end of such documents to the effect that he or she has read such document, then such debtor has, at a minimum, fraudulently uttered a false oath for purposes of § 727(a)(4)(A) in the form of such declaration . . . . [I]f a debtor plays any role in the publication of the false disclosure or omission itself, such as by providing or failing to provide relevant information to the preparer of his or her bankruptcy schedules or Statement of Financial Affairs, then such debtor has made a false oath in the form of such false disclosure or omission, which oath is also deemed to be fraudulently uttered by virtue of such debtor's failure to read such documents because, by not so reading, the debtor exhibits a reckless indifference to the truth, which recklessness . . . is the equivalent of fraud.

*Bohm v. Dolata (In re Dolata)*, 306 B.R. 97, 149-50 (Bankr. W.D. Pa. 2004) (citation omitted).

The fifth element of materiality requires that the false oath "'bears a relationship to the bankrupt's business transactions or estate or concerns the discovery of assets, business dealings or the existence or disposition of his property.'" *In re DeMartino*, 448 B.R. at 129 (quoting *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984)). "'[M]ateriality does not require a showing that the creditors were prejudiced by the false statement.'" *Carlucci & Legum v. Murray (In re Murray)*, 249 B.R. 223, 229 (E.D.N.Y. 2000) (quoting *In re Robinson*, 506 F.2d 1184, 1188 (2d Cir. 1974)). The requirement of materiality was judicially created to ensure that debtors are not denied discharge for inconsequential or technical misstatements. *In re Murray*, 249 B.R. 228 (citations omitted).

### III.   Application of Elements of § 727(a)(4)(A) to Debtors' Case

Applying the above analysis to the facts of this case leads to the inescapable conclusion that the Debtors' discharge must be denied.

The first prong of the test is that the Debtors made a statement under oath. The bankruptcy petition and annexed schedules are a series of statements under oath for purposes of § 727(a)(4)(A). *In re Bressler*, 387 B.R. at 460 (quoting *Nof v. Gannon (In re Gannon)*, 173 B.R. 313, 320 (Bankr. S.D.N.Y. 1994)). Thus, the first element of the test is met.

13

The second prong is satisfied for numerous statements made in the Petition are plainly not correct. It was established that there were at least three transfers to Mrs. Wolpe's mother totaling $2,500, yet on the SOFA the Debtors answer, "NONE," with respect to both payments made to creditors who are insiders and gifts made within one year of filing. The Debtors also fail to disclose on the SOFA a lawsuit resulting in a judgment. Additionally, when asked on the SOFA to list all other residences within three of the filing of the Petition, the Debtors respond, "NONE," despite having resided in at least two other addresses.

The Debtors also fail to schedule child support payments and inaccurately report income and expenses. There is no dispute that Mrs. Wolpe is entitled to receive child support on behalf of her children. There is an ongoing obligation as well as a claim for accrued support; the only question is the dollar amount owed. This is evident by the original support order, as well as the two subsequent child support modifications.

The Debtors' Schedule I and the Means Test both indicate the Debtors' monthly income is $9,383.37. This is inconsistent with both the Debtors' 2009 tax return and Rabbi Wolpe's employment contract with Temple Israel. Based on an annual salary of $160,000 under the employment contract, Rabbi Wolpe's gross monthly salary was $13,333, not $9,383.37. In their SOFA, the Debtors' list income from employment in 2009 as being $75,067. However, amortizing Rabbi Wolpe's gross monthly salary under his employment contract would result in gross prepetition income for 2009 of $101,261, not $75,067.[3] The Debtors' statement in their SOFA that they received no income other than from employment is also false as it is undisputed that the Debtors received payments totaling $10,000 from the Rabbinical Assembly, Rabbi Wolpe's mother, and Rabbi Alex Greenbaum.

---

[3] Rabbi Wolpe's gross monthly salary for each month of 2009 was $13,333 or $160,000 annualized. That constitutes a per diem gross salary of $438.36. Thus, the Rabbi's gross income for the 231 prepetition days of 2009 equates to gross prepetition income of $101,261 (231 x $438.36).

14

Additionally, the Debtors' failure to acknowledge any reasonably anticipated increase or decrease in their income on Schedule I is deceitful. Pursuant to Rabbi Wolpe's employment contract, his salary was scheduled to increase in July 2010 from $160,000 to $176,000. The Debtors had the opportunity to correct their misstatements when they amended Schedule I in December 2009. Instead, the Debtors continued to show Rabbi Wolpe as being employed at Temple Israel with a monthly income of $14,436.51. Meanwhile, Rabbi Wolpe had resigned from Temple Israel in November 2009, and he testified that he had no future employment with similar compensation.[4]

Pursuant to Rabbi Wolpe's employment contract, he received medical benefits from the Temple and a net pension allotment of $9,463, which the Debtors treated as ordinary income.[5] In addition, both the Kia payment and the Hebrew Academy tuition were paid directly by the Temple under the employment contract. Thus, the representation on Schedule J that these four payments were monthly expenses of the Debtors is false. No explanation by the Debtors was provided.

The third factor to be examined is whether the Debtors knew the statements were false. Clearly, because of the breathtaking diversity of the truthless statements made, from prior residences to monthly expenses to current and future income, each Debtor knew at least some of the statements were false, thus satisfying prong three of the § 727(a)(4) test. Rabbi Wolpe signed his employment contract. It was concise and very simple. His compensation was a combination of salary and benefits, all clearly defined. Yet in three different areas, Schedule I, the SOFA, and the Means Test, incorrect gross income amounts were given totaling in the tens of thousands of dollars on an annual basis. Also, between July 16, 2009 and August 31, 2009,

---

[4] This fact could possibly leave the Debtors ineligible for Chapter 13 under 11 U.S.C. § 109(e).
[5] The Debtors also did not report this on their 2009 IRS Tax Return which could have nonbankruptcy civil and/or criminal ramifications.

Rabbi Wolpe received $10,000 from three different sources. His bankruptcy case was commenced less than a month later, yet, conveniently, this income is not reported as required on the Means Test or SOFA. The July 2009, $9,463 net pension payment that morphed into additional ordinary income is also left on the sidelines.

Similarly, Rabbi Wolpe was asked to answer a simple question on Schedule I, whether he anticipated his salary would increase or decrease. He didn't have to anticipate anything; he knew that his salary would increase $16,000 in July of 2010 as per the signed contract. Yet he did not reply to the question at all; he simply left it blank. Likewise, he did not disclose that his income would plummet after he resigned from Temple Israel. Courts have previously found that a false oath may include a knowing and fraudulent omission. *Beer Sheva Realty Corp. v. Pongvitayapanu (In re Pongvitayapanu)*, 487 B.R. 130, 140 (Bankr. E.D.N.Y. 2013).

With respect to scheduling inaccurate monthly expenses on Schedule J, Rabbi Wolpe claims that he paid medical bills, a car payment, tuition and, on the amended Schedule J, a pension payment. However, these expenses were clearly covered by his employer, Temple Israel. Rabbi Wolpe had to have known that these expenses were not leaving his bank account each month. To say that he did not know these statements were not true would strain credibility to the breaking point. In fact, he specifically conceded that the funds were coming from the Temple regarding the tuition, medical expenses, and pension.

Rabbi Wolpe's false statements extend beyond income and expenses. Any competent adult would know if he had lived at a different address or had been sued more than once resulting in a judgment. To say these omissions on the SOFA were innocent errors, or forgotten facts, is simply not believable. With respect to the payments to Mrs. Wolpe's mother, Rabbi Wolpe

admitted to knowing of at least one of the three payments. Thus, he must shoulder that false statement by omission as well.

The amount of $452.77 is an odd, distinctive number important to this case. If that amount were to be deposited regularly into a person's bank account, the owner of the account would either know the origin of the funds or would inquire about it. Of course, the deposits were child support payments from Gary Schwack that should have been disclosed in the Means Test and pertinent schedules, but were not. To suggest that a step-father would be unaware of the support payments being made into his own bank account to assist the children in his care is unrealistic and not believable.

Rabbi Wolpe's credibility is further shaken by the fact that he did not schedule his Michigan real property anywhere in the petition. He testified he did not place it on Schedule A because he did not think he owned it due to a foreclosure. This statement, however, is belied by the fact that the foreclosure is not disclosed on the SOFA.

A large part of Mrs. Wolpe's testimony involved her relationship with her former spouse and the payment of child support. No aspect of child support is disclosed in the schedules, SOFA, or Means Test. Anyone examining this Chapter 7 case would be unaware of Mr. Schwack's obligation to Mrs. Wolpe, the years of child support paid, the years of child support yet due, or even the existence of Mr. Schwack. Mrs. Wolpe, like any normal mother, has been very aggressive in protecting her children regarding support. There were numerous emails between Mrs. Wolpe and Mr. Schwack during the summer of 2009, regarding changing support, expediting support, late support, and incorrect support. Obviously, her children and their well-being are central issues in Mrs. Wolpe's life. For her to suggest that she did not recall numerous emails she sent to her ex-spouse concerning support shortly before filing for bankruptcy is

simply inconceivable. There were other evasive statements throughout her tenure on the witness

stand, none of which are credible. To suggest that Mrs. Wolpe couldn't recall any of these

details of the child support her ex-spouse was obligated to pay is not believable. The court is

convinced that Mrs. Wolpe knew that she was entitled to both current and back child support and

knew or should have known that such information had not been disclosed.

Another example of inconsistent testimony concerns a jewelry purchase. Mrs. Wolpe

testified that in her family it is a tradition to honor a sixteenth birthday; a tradition started by her

grandfather. At a deposition, she was asked about a $950 jewelry purchase on a certain day in

New York City. She testified that she had no recollection of that purchase. The court has no

faith in her testimony. The purchase was to celebrate her niece's sixteenth birthday and to

continue the family's tradition. This is not a simple, forgettable purchase. This is an unusual

acquisition involving an out of town trip, a niece, her sixteenth birthday, and a grandfather's

tradition.

The ultimate false statements are the four declarations executed in connection with the

Debtors' bankruptcy petition, schedules, and SOFA, signed under penalty of perjury by the

Debtors indicating that the information provided in the submitted documents is true and correct.

Because the court has found the above statements are knowingly false, by definition, all the

declarations are knowingly false as well. Mrs. Wolpe declared at trial that she had not read the

information contained in the Petition. This offers no safe harbor from § 727(a)(4). If a debtor

fails to read the petition or accompanying documents but nevertheless signs the declaration

therein that she has done so, then such debtor has, at a minimum, fraudulently uttered a false oath

for purposes of § 727(a)(4)(A). *In re Dolata,* 306 B.R. at 149-50. A debtor has a paramount

duty to carefully consider the questions posed on the petition, schedules, and statements and to

verify that all information is correct. *Neary v. Cline (In re Cline)*, Case No. 09-45977-DML-7,

Adv. No. 09-4424, 2010 WL 3944997, at *4 (Bankr. N.D.Tex. Oct. 6, 2010) (citation omitted).

It is also worth noting that Mrs. Wolpe cannot claim ignorance of the bankruptcy process as she

had previously filed a bankruptcy case in Florida.

What is most troubling in this case, is the Debtors' lack of candor. When confronted with

all these irregularities, the most common response from both Debtors is a claim that they did not

know or could not remember. This court cannot find that excuse valid for each irregularity.

The fourth prong of the test is that the false statements must have been made with

fraudulent intent. The cumulative effect of the Debtors' misstatements and omissions in the

petition, schedules, and SOFA evidences a reckless disregard for the truth on the part of the

Debtors satisfying the fraudulent intent requirement of § 727(a)(4)(A). Much of the information

regarding the Debtors' financial superstructure, such as income, expenses and transactional

history is unequivocally wrong. It is not complicated: How much do you earn? Is your salary

going to increase or decrease? What are your expenses? What income have you taken in during

the last six months? Where have you lived? Have you been sued? Have you paid relatives?

Are you owed support? What are your assets? These everyday issues are crucial for the honest

administration of the bankruptcy system. In this court's experience, the Wolpes' case is the most

flawed in its memory.

The Debtors attempt to argue that all the inconsistencies and errors could not have been

intentional, as they posed no benefit to the Debtors in connection with their original Chapter 7.

The court, however, does not need to find that the facts were omitted or incorrect for the specific

purpose of perpetrating a fraud as the aggregate effect of all the inaccuracies evidences a pattern

19

of reckless indifference to the truth on the part of the Debtors, which is serious enough to satisfy the fraudulent intent required by § 727(a)(4)(A).

Based upon the foregoing, the burden has shifted, requiring a credible explanation from the Debtors for the litany of errors. They have none, other than to place the responsibility on their former counsel, Attorney Goldin. "An explanation by the debtor that he acted on advice of counsel, who in turn was fully aware of all the relevant facts, generally rebuts an inference of fraud." *In Re Dubrowsky*, 244 B.R. at 573. However, this defense must fail when the information sought is so straightforward that it requires no legal explanation for an individual to understand the nature of the inquiry. *Id.*; *see JPMorgan Case Bank, N.A. v. Koss (In re Koss)*, 403 B.R. 191, 214 (Bankr. E.D. Mass. 2009) (citation omitted) (advice of counsel is no defense where it should have been evident that the assets ought to be listed).

Here, there are two problems with the Debtors' argument. First, Attorney Goldin, as stated in his motion to be relieved and confirmed at trial, did not have complete and accurate information. Thus, he was not "fully aware of all relevant facts." Additionally, the information sought from the Debtors was straightforward and required no legal interpretation for an individual to comprehend. It is "transparently plain" that correct income, expenses, and transactional information should have been provided regardless of the advice of counsel. *See In re Colvin*, 288 B.R. 477, 483 (Bankr. E.D.Mich. 2003) ("The schedules made it 'transparently plain' to the debtors that they were required to disclose tax refunds even if their attorney did not inform them of that specific disclosure obligation." (quoting *Zitwer v. Kelly (In re Kelly)*, 135 B.R. 459, 461 (Bankr. S.D.N.Y. 1992)). For the court to give countenance to the informational graveyard before it, would be to invite wholesale chaos on the system and its participants. The fourth part of the test is satisfied.

The remaining question is whether the false statements are material. Contrary to the Debtors' assertions, the fifth and final element § 727(a)(4)(A) is met. The false statements in the Petition clearly relate to the Debtors' estate and possibly would have led to the discovery of assets, business dealings, or the existence or disposition of property.

"'The price of a discharge in bankruptcy is high, and the disclosure requirements of the Bankruptcy Code and Rules are onerous.'" *In re Pongvitayapanu*, 487 B.R. 130, 138 (quoting *In re Arana*, 456 B.R. 161, 169 (Bankr. E.D.N.Y. 2011)). The disclosure, however, is essential in order to properly administer the bankruptcy estate and to ensure the integrity of the process. The case *sub judice* highlights over and over again a myriad of mistakes, inconsistencies, and falsities that require this court to find no other outcome than a clear violation of § 727(a)(4)(A) by both Debtors individually. It is incomprehensible that nearly twenty substantial errors exist in the Debtors' original petition and that there are at least four more after amended schedules were filed. Further, the testimony elicited from the Debtors consists mostly of their failure to remember or their attempt to hide behind their attorney's advice. While in some situations these defenses could have proven to have been legitimate, at the end of the day these Debtors, as is true for all debtors, are and must continue to be liable for the entries they made on the Petition, which are ultimately evidenced by their signatures declaring that the information is true.

Having found sufficient evidence to deny the Debtors' discharge pursuant to § 727(a)(4)(A), the court will not address the Plaintiffs' § 727(a)(4)(B) claim.

## CONCLUSION

For the foregoing reasons, judgment is granted in favor of the Plaintiffs as to

§ 727(a)(4)(A), and the Debtors are denied a discharge.

It is SO ORDERED.

Dated: April 18, 2013                        /s/ Robert E. Littlefield, Jr.
      Albany, New York                        Hon. Robert E. Littlefield, Jr.
                                       Chief United States Bankruptcy Judge